THE ATTORNEY GENERAL, EX REL. JOHN T. RICH, GOV-
ERNOR, V. JOHN W. JOCHIM.

*Constitutional law—State officers—Removal by Governor.*

1. Section 35, art. 6, of the Constitution, which provides that "the
   style of all process shall be, 'In the Name of the People of
   the State of Michigan,'" applies to the judicial department
   only.

2. A citation by the Governor to State officers to appear before
   him, and show cause why they should not be removed from
   office, is not an official act, within the meaning of section 18,
   art. 5, of the Constitution, which provides that "all official
   acts of the Governor, his approval of the laws excepted, shall
   be authenticated by the great seal of the State."

3. Section 8, art. 12, of the Constitution, which provides that "the
   Governor shall have power, and it shall be his duty, except at
   such time as the Legislature may be in session, to examine
   into the condition and administration of any public office, and
   the acts of any public officer, elective or appointed, to remove
   from office for *gross neglect of duty*, or for corrupt conduct
   in office, or any other misfeasance or malfeasance therein,
   either of the following State officers, to wit, the Attorney Gen-
   eral, State Treasurer, Commissioner of Land Office, Secretary
   of State, Auditor General, Superintendent of Public Instruc-
   tion, or members of the State Board of Education, or any other
   officer of the State, except legislative and judicial, elective or
   appointed, and to appoint a successor for the remainder of
   their respective unexpired term of office," is not in conflict
   with section 1 of the fourteenth amendment to the Constitu-
   tion of the United States, which provides that no state shall
   "deprive any person of life, liberty, or property, without due
   process of law."

4. The Secretary of State, State Treasurer, and Commissioner of
   the State Land Office, while acting as members of the Board
   of State Canvassers, are guilty of gross neglect of duty, within
   the meaning of the constitutional provision above cited, in cer-
   tifying as correct a tabulated statement prepared by their
   clerks, to whom the returns of election were turned over, pur-
   porting to show the number of votes cast for and against a
   constitutional amendment, without comparing or examining
   the returns from any county, or comparing them with said

tabulated statement, and in reliance solely upon the statements of said clerks that said tabular statement is correct.

5. The following propositions are summarized from the opinion of Mr. Justice HOOKER:

*a*—The question of the jurisdiction of the Supreme Court to review or pass upon the official acts of a co-ordinate branch of government was not raised in this case.

*b*—The fourteenth amendment to the Constitution of the United States, in so far as it provides that no State shall " deprive any person of life, liberty, or property, without due process of law," conferred no new right upon officeholders in this State, nor did its adoption modify the power of the Governor to remove certain State officers under section 8, art. 12, of the Constitution.

*c*—In order to sustain the contention that said section is in conflict with the provision of the Federal Constitution above set forth, it must appear that the removal from office is a deprivation of the officer removed of his property, and that such removal is sought to be accomplished without due process of law.

*d*—A public office cannot be called " property," within the meaning of section one of the fourteenth amendment to the Constitution of the United States, and section 32 of article 6 of the Constitution of Michigan, which provide that no person shall be deprived of life, liberty, or property without due process of law.

*e*—The Legislature may remove officers, not only by abolishing the office, but by an act declaring it vacant, as was done by section 13 of Act No. 140, Laws of ·1891, which abolished the boards of managers of the several State institutions consolidated under said act, and annulled all appointments of officers and agents at said institutions.

*f*—As all statutory offices are taken subject to legislative action, so all constitutional offices are taken subject to constitutional changes, and both are upon the terms and subject to the conditions existing by law; and one of the constitutional conditions upon which the Secretary of State takes his office is that he will be subject to removal by the Governor, under section 8, art. 12, of the Constitution; citing *Frey v. Michie,* 68 Mich. 328; *Fuller v. Attorney General,* 98 Id. 96.

*g*—If the " due process of law," to which the respondent claims to be entitled under the constitutional provisions cited, can mean nothing less than a trial by the constitutional judiciary, and perhaps a jury, as contended by his counsel, it must be because the constitutional office differs from the statutory office, as several cases hold that removals from the latter may

be made without the intervention of courts; citing *Dullam v. Willson*, 53 Mich. 392; *Clay v. Stuart*, 74 Id. 415; *Wellman v. Board of Police*, 84 Id. 558, 91 Id. 427; *Fuller v. Attorney General*, 98 Id. 96.

*h*—The words "due process of law," as used in article 6, § 32, of the Constitution, mean the law of the land, by which are to be understood laws which are general in their operation, and not special acts of legislation passed to affect the rights of particular individuals against their will, and in a way in which the same rights of other persons are not affected by existing laws; citing *Sears v. Cottrell*, 5 Mich. 251.

*i*—The State is not so bound by the term "due process of law," in the Constitutions, that it is impossible for it to invest its agents with its offices without subjecting itself to the delays and uncertainties of strict judicial action in cases. of emergency.

*j*—It does not follow, because the action of the Governor under the section cited is, in a sense, judicial, that the investigation must be made by some other person or officer, who must make complaint to the Governor, and procure counsel, or that the Governor is necessarily interested, and thereby disqualified from hearing and determining, because he performs the other duties which are specifically imposed upon him by this section of the Constitution.

*k*—It is the duty of the Governor to investigate, using all lawful means to go to the bottom of any real or supposed irregularity; and, to that end, he may use clerks and expert accountants, if necessary,—and it is fair to presume that the State would recognize the expenses as legitimate obligations. The law does. not require a complainant, nor prevent the Governor from committing the interests of the State to competent lawyers, official or otherwise. Finally, the Governor acts judicially upon the accumulated evidence, and such explanations by way of defense as the respondent may offer; and in this respect his action is similar to that discussed in *Fuller v. Attorney General*, 98 Mich. 96.

*l*—While there is an inclination upon the part of the average American to accept good intentions as an excuse for mistakes, it is not for the general public good that responsible public offices shall be confided to, or remain in the custody of, those whose duties and responsibilities rest so lightly upon them as to permit the public interests to be injured or endangered through neglect; and when such neglect, from the gravity of the case, or the frequency of the instances, becomes so serious in its character as to endanger or threaten the public welfare, it is *gross*, within the meaning of the law, and

justifies the interference of the executive, upon whom is placed, by this amendment, the responsibility of keeping the affairs of State in a proper condition.

*m*—It is true that this section of the Constitution confers great power upon the Governor; but the governorship is an exalted office,—one which ought to carry with it a presumption of integrity of character and breadth of mind commensurate to its importance, —and it would be a sad commentary upon free government if it were otherwise. But the powers of the Governor are carefully restricted, and there is no occasion to pursue the illusive phantoms of possibility. When abuses arise, they will doubtless be speedily and effectively met.

Information in the nature of *quo warranto* to test the title of respondent to the office of Secretary of State. Argued March 6, 1894. Demurrer overruled, and judgment of ouster entered, March 20, 1894. The facts are stated in the opinion.

*A. A. Ellis*, Attorney General (*Geer & Williams* and *Cahill & Ostrander*, of counsel), for relator.

*Smith, Lee & Day* (*John Atkinson* and *Fred A. Baker*, of counsel), for respondent.

HOOKER, J. By Constitution (art. 8, § 4), and by statute (How. Stat. § 202), the Board of State Canvassers is made to consist of the Secretary of State, State Treasurer, and Commissioner of the State Land Office. It is the duty of this board to canvass the returns from the various counties of the State, and declare the result, of elections for State officers and upon constitutional amendments. At the spring election in the year 1893, four amendments to the Constitution were voted upon by the electors of the State, one of which provided for an increase of the salaries of several of the State officers, including the Secretary of State and the Commissioner of the State Land Office. These amendments were, by the Board of Canvassers, declared carried. Subsequently, the returns were recanvassed

by the board, in obedience to a writ of *mandamus* issued
by this Court, when it was found and declared that the
amendment relating to salaries was defeated. Proceedings
were then taken by the Governor, which culminated in an
order by him removing each of said officers from his office,
and declaring the same vacant; and, respondents refusing
to surrender their respective offices, informations in the
nature of *quo warranto* were filed in the name of the
Attorney General, upon relation of the Governor, to try
their right to such offices. This is the proceeding against
the Secretary of State.

The questions in the case are raised by the replication
and the demurrer of respondent thereto. In answer to
the plea, which asserts respondent's election and accession
to the office of Secretary of State, the replication sets up
in detail the facts upon which the relator's claim is based,
viz.: That relator was the duly elected and acting Gov-
ernor of this State; that, as such, it became and was his
duty, under section 8 of article 12 of the Constitution, to
inquire into the condition and administration of the office
of Secretary of State, and the manner in which respond-
ent performed the duties of such office, for the purpose
of determining whether said respondent had been guilty
of gross neglect of duty in relation to his duties as a
member of the Board of State Canvassers, and to remove
respondent from said office for gross neglect of duty, if he
should be found guilty thereof; that, a charge of that
kind having come to the knowledge of the relator, he
caused written notice to be served upon the respondent,
which notice required him to appear before the relator,
and show cause why he should not be removed from his
office of Secretary of State for gross neglect of duty in
connection with the canvass of the returns in relation to
said amendment relating to salaries of State officers, such
notice containing specific charges of neglect, as follows:

"Executive Office,
"Lansing, February 6, 1894.
"To John W. Jochim, Secretary of State, Joseph F. Hambitzer, State Treasurer, and John G. Berry, Commissioner of the State Land Office, Composing the Board of State Canvassers.

"*Gentlemen:* Public charges have been made, and have come to my knowledge, that gross errors were made in the canvass of the returns of votes given in the various counties at the election held in this State on the first Monday in April, A. D. 1893, for and against the adoption of Joint Resolution No. 10, approved March 9, 1893, entitled 'Joint Resolution proposing an amendment to section one (1), article nine (9), of the Constitution of this State, relative to the salaries of State officers,' by which it was made to appear that such amendment to the Constitution had been ratified and approved by a majority of the electors voting thereon, whereas, it is alleged that, by a true and correct canvass of the returns of such votes, the said amendment was defeated. Under the power granted and duty imposed upon me, as Governor of this State, by section eight (8) of article twelve (12) of the Constitution, it became necessary to inquire into the administration and condition of your several offices, and especially into the manner in which you have, severally and collectively, performed the duties of the Board of State Canvassers, of which you are *ex officio* members, for the purpose of determining whether you have been guilty of gross neglect of duty in the matter of canvassing the said returns.

"You are therefore severally cited and required to appear before me, at the executive office in the city of Lansing, on the 15th day of February, 1894, at 1 o'clock in the afternoon, then and there to answer to the following specific charges, viz.:

"1. That you, the said John W. Jochim, Secretary of State, Joseph F. Hambitzer, State Treasurer, and John G. Berry, Commissioner of the State Land Office, who are the Board of State Canvassers under the Constitution and laws of this State, were, each and every one of you, guilty of gross neglect of duty, in this: That you did not, nor did either of you, examine the statements or returns of votes from the several counties, filed in the office of the Secretary of State, showing the number of votes cast for and against said proposed amendment to the Constitution relative to the salaries of State officers, by the electors in this State at the election in April, 1893.

"2. That you were severally guilty of gross neglect of duty, in this: That you did not, nor did either of you, ascertain and determine the result of such vote, nor perform with due and proper care the duties relating to canvassing the statements and returns from the several counties of the votes given at such election for and against said proposed amendment to the Constitution, required

of and imposed upon you, as members of the said Board of State Canvassers, by the Constitution and laws of this State.

" 3. That you were severally guilty of gross neglect of duty, in this: That you made, and suffered to be made, gross errors in the canvass of the statements and returns filed in the office of the Secretary of State of the votes given in the several counties at said election in April, 1893, for and against said proposed amendment to the Constitution, by which it was falsely made to appear that such proposed amendment had been approved and ratified by a majority of the electors voting thereon, whereas, by a true and correct canvass of the said statements and returns, the said proposed amendment was defeated.

" 4. You are further required, then and there, to show cause why you, and each of you, should not be removed from office for gross neglect of duty.

"JOHN T. RICH, Governor."

The replication further alleges that the respondent appeared by counsel before relator, and moved to vacate the notice and dismiss the charges, for reasons following:

"1. The Governor has no power, under section 8 of article 12, or any other provision of the Constitution, to remove the respondents, or either of them, from their respective offices, for any misconduct on their part, or on the part of either of them, as members of the Board of State Canvassers.

" 2. The power of the Governor, under section 8, article 12, of the Constitution, is confined to the official misconduct of the officers therein named, in the performance of the duties appertaining to each of said officers, separately and severally considered; and it does not include such duties as are performed by such officers, jointly with others, as members of constitutional or statutory bodies or boards.

" 3. The House of Representatives, under sections 1, 2, and 3, article 12, of the Constitution, has the sole power to direct an impeachment of these respondents for misconduct in the performance of their duties when acting as a Board of State Canvassers, and the Senate has exclusive jurisdiction to try any such impeachment.

" 4. The charges set forth in the notice served upon these respondents are wholly insufficient and fatally defective, for the reason that it is not alleged therein that the neglect of these respondents, or any of them, was intentional, or that they, or either of them, have knowingly and designedly neglected any official duty, or that they, or either of them, have neglected to perform any duty with an evil intent, or for any improper, illegal, or culpable purpose.

" 5. The charges contained in said notice do not make or state a case of gross neglect of duty, within the meaning of section 8, article 12, of the Constitution; and the Governor, sitting as a court of impeachment, has no jurisdiction or power to render judgment of removal thereon.

" 6. The notice served on respondents is void because it is not 'In the Name of the People of the State of Michigan,' as required by section 35 of article 6 of the Constitution, and it is not authenticated by the great seal of the State, as required by section 18 of article 5 of the Constitution.

" 7 The Board of State Canvassers is created by the Constitution of this State, and, in the performance of their duties and functions, the members of said board, in the absence of conduct on their part amounting to a criminal offense, are not subject to the control or interference of the Governor of the State, or of any other branch or department of the government; and, excepting the power of the Legislature to determine any case where the decision of the State Board of Canvassers is contested, they are answerable or amenable only to the people of the State, by whom they were elected to their respective offices."

It is further alleged that the motion was denied; that evidence was introduced in support of the information, as follows:

1. The returns from the several counties, showing the vote upon said amendment.

2. The canvass of said returns, purporting to have been made and signed by respondent and the other-members of the Board of State Canvassers upon May 16, 1893, from which it appears that the said amendment was carried by a majority of 1,821 votes.

3. The canvass of said returns subsequently made by said officers, under the order of the Supreme Court, showing the defeat of said amendment by 11,455 votes.

4. Vouchers showing the amounts paid to respondent and the other members of said board for their expenses in making said canvasses.

5. A stipulation by counsel that a short time prior to May 16, 1893, respondent was notified by his clerks that a tabulated statement showing the votes for and against said amendment had been prepared, and was ready to be signed by the members of the State Board of Canvassers; that thereupon respondent notified the other members of said board by telegram, in response to which they came to Lansing, and signed said tabulated statement prepared by

their clerks; that neither of them compared or examined the returns from any county, nor did they compare them with the tabulated statement aforesaid; that they relied upon what their clerks stated about such statement being correct, and, believing it to be so, signed it; and that was all that they had to do with it.

The replication further states that no evidence was offered upon the part of respondent; that an order adjudging respondent guilty, and removing him from his said office, was thereupon made, and duly served upon said respondent, upon the 19th day of February, 1894. As stated, a demurrer to this replication was filed.

The important questions presented by this record are (1) the power of the Governor to remove respondent; (2) the sufficiency of the cause alleged. The jurisdiction of this Court to review or pass upon the official acts of a co-ordinate branch of government was not discussed. It was referred to in the brief of counsel for the relator, with an express disavowal of a desire to raise the question. We shall therefore omit a discussion of that subject.

Whatever authority the Governor has to remove respondent must be found in section 8 of article 12 of the Constitution, which reads as follows:

" The Governor shall have power, and it shall be his duty, except at such time as the Legislature may be in session, to examine into the condition and administration of any public office, and the acts of any public officer, elective or appointed, to remove from office for gross neglect of duty, or for corrupt conduct in office, or any other misfeasance or malfeasance therein, either of the following State officers, to wit: The Attorney General, State Treasurer, Commissioner of Land Office, Secretary of State, Auditor General, Superintendent of Public Instruction, or members of the State Board of Education, or any other officer of the State, except legislative and judicial, elective or appointed, and to appoint a successor for the remainder of their respective unexpired term of office, and report the causes of such removal to the Legislature at its next session."

It is contended that this section is in violation of the amendment of the Constitution of the United States which provides that no state shall "deprive any person of life, liberty, or property, without due process of law." Const. U. S. Amend. 14, § 1. As the Constitution of this State contains the same provision (section 32, art. 6), no new right was conferred upon officeholders, nor was any modification of the power of the Governor to remove officers under section 8, art. 12, consequent upon the adoption of the fourteenth amendment. Any question that can now be raised upon the latter could have been raised under the former at any time since section 8, art. 12, was adopted; and all decisions upon section 32, art. 6, are applicable to this provision of the fourteenth amendment, unless in contravention of federal decisions thereon. To sustain this point it must appear (1) that the removal from office is a deprivation of the respondent of his property; and (2) that it was sought to be accomplished without due process of law.

A public office cannot be called "property," within the meaning of these constitutional provisions. If it could be, it would follow that every public officer, no matter how insignificant the office, would have a vested right to hold his office until the expiration of the term. Public offices are created for the purposes of government. They are delegations of portions of the sovereign power for the welfare of the public. They are not the subjects of contract, but they are agencies for the State, revocable at pleasure by the authority creating them, unless such authority be limited by the power which conferred it. In the case of *City of Wyandotte v. Drennan,* 46 Mich. 480, Mr. Justice COOLEY, in giving the opinion of the Court, said:

"It is claimed, however, that, when the salary is fixed at the time when the office is accepted, the acceptance is presumed to have the salary in view, and a contract is

thereby effected between the officer and the city, which neither can change without the consent of the other. This is a position that has frequently been taken, and almost as often overruled. Nothing seems better settled than that an appointment or election to a public office does not establish contract relations between the person appointed or elected and the public. The leading case of *Butler v. Pennsylvania*, 10 How. 402, has been universally regarded as having settled that question, and it has been followed by decisions in numerous cases. The salary or other compensation is therefore at the discretion of the legislative authority of the State, or of such other authority as the Legislature has seen fit to intrust it to. This was indirectly recognized in *Chapoton v. Detroit*, 30 Mich. 636,—a case which is in point here.

"It is said on behalf of the defendant in error that the principle above stated rests on the right of the officer to resign and give up his office at any time; and it is further said this right did not exist in the case of this officer, because he could only resign to the common council,—the very body that reduced the salary,—and the council might keep him in by refusing to accept his resignation. Whether the council could in this way compel the recorder to continue in the performance of his duties we do not care to consider in this case, because we think the legislative authority over the subject does not depend upon the existence or non-existence of any such power. Offices are created for the public good, at the will of the legislative power, with such powers, privileges, and emoluments attached as are believed to be necessary or important to make them accomplish the purposes designed. But, except as it may be restrained by the Constitution, the Legislature has the same inherent authority to modify or abolish that it has to create; and it will exercise it with the like considerations in view. Whoever accepts a public office must accept it with this principle of constitutional law in view; and, if his compensation is reduced below what seems to him reasonable, it may be a hardship, but it is not a legal wrong. The legislative power is ample, and he is supposed to know when he takes the office that it is liable to be exercised."

The Legislature may remove officers, not only by abolishing the office, but by an act declaring it vacant, as was done by Act No. 140, § 13, Laws of 1891. *Throop v.*

*Langdon,* 40 Mich. 673; *Auditors v. Benoit,* 20 Id. 184. And it may lodge the power to remove from statutory offices in boards or other officers, subject to statutory regulations. And, while it cannot remove incumbents of constitutional offices, it is not because of an inherent difference in the qualities of the office, but because the power to remove is limited to the power that creates. The constitutional officer is an agent of government. There is the same lack of the ingredients of contract, and the same power to abolish the office or remove the officer by amendment of the Constitution. *City Council v. Sweeney,* 44 Ga. 463; *Butler v. Pennsylvania,* 10 How. 402.

The fact that some cases hold that removals from office cannot, in some instances, be made, except upon cause shown, upon notice, specific charges, and after a hearing in its nature judicial, does not militate against this doctrine. These cases simply hold that removals are limited by the power of the people or Legislature, through the Constitution or statute; not that a vested property right is involved in the holding of office, or that removal is beyond the power which creates the office and the officer. Nor does it follow that removal from office is a deprivation of the officer of property, because it must be for cause, upon specific charges, and after an opportunity to be heard. Many cases may be found that speak of the disgrace of removals, and the right to hold an office under election. Of these the case of *Page v. Hardin,* 8 B. Mon. 672, perhaps, goes the furthest.

The case of *Dullam v. Willson,* 53 Mich. 393, discusses section 8, art. 12, holding that it was not designed to confer upon the Governor power to remove without charges and hearing; but it recognizes the power of the people over public offices, and sustains the authority of

the Governor, under this section, to remove for cause.
Mr. Justice CHAMPLIN says:

"That under the amendment the Governor was vested
with the power of determining whether the specified causes
exist, appears to me too plain for serious contradiction.
I fully concur in the views expressed upon this point by
the learned counsel for the respondent (Judge Chris-
tiancy), wherein he says: 'It was competent, by constitu-
tional amendment, to authorize him to exercise *such
judicial power*. And while this amendment gives the
power of removal only for the causes which it specifies
(which, though similar· in character, are not identical with
those specified in the statute), and the question of the
officer's guilt is one judicial in its nature, yet the amend-
ment *imposes a duty and confers upon the Governor the
power " to examine into the condition and administration
of the office and public acts of the officers" to which it
applies, and to remove them from office for the causes there
enumerated;* thus, in effect, giving him the right to try
the question whether the officer is guilty or not, and to
remove him from his office.' The counsel for the respond-
ent, while granting this, insist that such removal cannot
be made without charges, notice, and an opportunity for
defense, and this I consider the important question in the
case. *Unless it is the manifest intention of the section*
under consideration that the proceedings should be *ex
parte* as well as summary, a removal without charges,
notice, and an opportunity for defense cannot be upheld."

Again, as all statutory offices are taken subject to legis-
lative action, so all constitutional offices are taken subject
to constitutional changes, and both are upon the terms
and subject to the conditions existing by law. One of the
constitutional conditions upon which the respondent took
his office was that he would be subject to removal by the
Governor, under article 12, § 8. *Frey v. Michie,* 68 Mich.
328; *Fuller v. Attorney General,* 98 Id. 96.

But conceding, for the argument, that the office is a
vested property right, what is the "due process of law"
to which the respondent is entitled, under the constitutions

of this State and the United States? Counsel contend
that it can mean nothing less than a trial by the consti-
tutional judiciary, and perhaps a jury. If so, it must be
because the constitutional office differs from the statutory
office, as several cases hold that removals from the latter
may be made without the intervention of courts. *Dullam
v. Willson,* 53 Mich. 392; *Clay v. Stuart,* 74 Id. 415; *Well-
man v. Board of Police,* 84 Id. 558, 91 Id. 427; *Fuller v.
Attorney General,* 98 Id. 96. But this language of the
constitutions means less than that. The words "due process
of law," as used in the Constitution (article 6, § 32),
mean the law of the land, by which are to be understood
laws which are general in their operation, and not special
acts of legislation passed to affect the rights of particular
individuals against their will, *and in a way in which the
same rights of other persons are not affected by existing laws.
Sears v. Cottrell,* 5 Mich. 251. Due process is not neces-
sarily judicial process. Administrative process, which has
been regarded as necessary in government, and sanctioned
by long usage, is as much due process as any other.
*Weimer v. Bunbury,* 30 Mich. 201. In this case the treas-
urer of the city of Niles did not collect and pay over to
the county treasurer certain taxes, whereupon, in accord-
ance with the statute, the county treasurer issued a war-
rant to the sheriff, commanding him to levy and collect
the amount from the property of the city treasurer. It
was held not to invade article 6, § 32.

The federal decisions also qualify the claim of respond-
ent's counsel. In *Ex parte Wall,* 107 U. S. 265, it is
said that what is due process of law in the state is reg-
ulated by the law of the state. The requirement of the
Constitution that a person cannot be deprived of his prop-
erty without due process of law does not imply that all
trials in the state courts, affecting property, must be by
jury.

"Due process of law does not require a plenary suit and a trial by jury in all cases where property or personal rights are involved. * * * It is, in all cases, that kind of procedure which is suitable and proper to the nature of the case, and sanctioned by the established customs and usages of the courts."

See, also, *Railroad·Co. v. Town of Bristol*, 14 Sup. Ct. Rep. 437.

In *Den v. Improvement Co.*, 18 How. 272, Curtis, J., says:

"For, though 'due process of law' generally implies and includes *actor, reus, judex*, regular allegations, opportunity to answer, and a trial according to *some* settled course of *judicial proceedings*, yet this is not universally true."

This case, by an exhaustive review of English and American authorities, vindicates summary methods on the part of the government to obtain its due from a tax collector, analogous to the proceedings in the case of *Weimer v. Bunbury*. Certainly, the resort to similar proceedings by the government to reclaim its offices may be equally necessary and justifiable. In a discussion of this subject in the case of *Davidson v. New Orleans*, 96 U. S. 103, Mr. Justice Miller said:

"The history of the English mode of dealing with public debtors, and enforcing its revenue laws, is reviewed [referring to *Den v. Improvement Co., supra*], with the result of showing that the rights of the crown, in these cases, had always been enforced by summary remedies, without the aid of the usual course of judicial proceedings, though the latter were resorted to in the exchequer court when the officers of the government deemed it advisable. And it was held that such a course was 'due process of law,' within the meaning of that phrase, as derived from our ancestors, and found in our Constitution.

"It is not a little remarkable that while this provision has been in the Constitution of the United States, as a restraint upon the authority of the federal government, for nearly a century, and while, during all that time, the

manner in which the powers of that government have been exercised has been watched with jealousy, and subject to the most rigid criticism in all its branches, this special limitation upon its powers has rarely been invoked in the judicial forum or the more enlarged theater of public discussion. But while it has been a part of the Constitution, as a restraint upon the power of the states, only a very few years, the docket of this court is crowded with cases in which we are asked to hold that state courts and state legislatures have deprived their own citizens of life, liberty, or property without due process of law. There is here abundant evidence that there exists some strange misconception of the scope of this provision, as found in the fourteenth amendment. In fact, it would seem from the character of many of the cases before us, and the arguments made in them, that the clause under consideration is looked upon as a means of bringing to the test of the decision of this court the abstract opinions of every unsuccessful litigant in a state court of the justice of the decision against him, and of the merits of the legislation on which such a decision may be founded."

See, also, *Springer v. U. S.*, 102 U. S. 586; *Hilton v. Merritt*, 110 Id. 97, 107; *Campbell v. Holt*, 115 Id. 620; *Railway Co. v. Humes*, 115 Id. 512; *Provident Institution v. Jersey City*, 113 Id. 506; *Garrison v. City of New York*, 21 Wall. 196.

From these authorities, it appears that the State is not so bound by the term "due process of law," in the Constitutions, that it is impossible for it to invest its agents with its offices without subjecting itself to the delays and uncertainties of strict judicial action in cases of emergency. While in many cases (and, under the decision in the case of *Dullam v. Willson*, perhaps in this) the power of removal is a limited and restricted one, to be exercised along given lines and with prescribed formalities, as already stated, it is not by reason of an inherent right of property in the officer, bringing him within the protection of the fourteenth amendment, but because of the limitations of the law. The Michigan cases already cited settle

for this State the authority of the Governor, under the Constitution.

It is said, however, that the Governor, in this case, made his own charges and employed his own counsel, and is therefore to sit as judge in his own case. One of the duties of the Governor, under section 8, art. 12, is to investigate the State offices. He is given inquisitorial power, that he may ascertain their condition, for the public welfare. No other means is provided for acquiring the necessary information. If he discovers irregularities of particular character, it is his *duty* to remove the officer, and supply his place by appointment, reporting his action to the Legislature at the next session. *Dullam v. Willson* is authority for the proposition that the incumbent is entitled to notice of the charge, and an opportunity to be heard in his defense. This necessarily implies that the Governor's action is, in a sense, judicial. But it does not follow that the investigation must be made by some other person or officer, who must make complaint to the Governor; that the complainant must procure counsel; or that the Governor is necessarily interested, and thereby disqualified from hearing and determining, because he performs the other duties which are specifically imposed upon him by this section of the Constitution. It is no uncommon thing for judges to order arrests and prosecution for acts committed in their presence, such as contempts, perjury, and perhaps other offenses, and they are not thereby disqualified. There is nothing in the record to show any interest upon the part of the Governor, further than to ascertain the condition of the office, and to act upon the information obtained as the Constitution requires. It is the duty of the Governor to investigate, using all lawful means to go to the bottom of any real or supposed irregularity. To that end, he may use clerks and expert accountants, if necessary,—and it is fair to presume that

the State would recognize the expenses as legitimate obligations. The law does not require a complainant, nor prevent the Governor from committing the interests of the State to competent lawyers, official or otherwise. Finally, the Governor acts judicially upon the accumulated evidence, and such explanations by way of defense as the respondent may offer. In this respect his action is similar to that discussed in *Fuller v. Attorney General,* which discussion it is unnecessary to repeat.

We come next to the charges. It is contended that they are insufficient, because the act is not alleged to have been intentional, and because it was not gross neglect to permit an erroneous canvass by clerks; further, that the act was not within the provision of section 8, because it was an act done by the respondent as a member of the Board of Canvassers, and not as Secretary of State, and that the only remedy was by impeachment by the Legislature. To these is impliedly added, and strenuously argued, that the Legislature could not impeach for gross neglect, and that, therefore, the Governor could not remove for such neglect. It is true that before the defalcation of the State Treasurer, in 1860, the Governor could not remove a constitutional officer, and that a defaulting treasurer had the lawful authority to continue to receive the public funds until the Legislature should convene, and proceed by impeachment to secure his removal. Doubtless, this condition of affairs, as counsel assert, led to the adoption of the amendment of 1862, viz., article 12, § 8. It is also true that section 1, art. 12, gives to the Legislature the sole power to impeach civil officers for corrupt conduct in office, or for crimes and misdemeanors. If no further power of impeachment existed than as mentioned in section 1, it must be conceded to follow that the Governor was granted a broader power of removal than the Legislature had by way of impeachment. But the people had

the undoubted power to authorize removals by the Governor for causes not theretofore mentioned as a ground for impeachment. They certainly made it his duty to remove for gross neglect, and we cannot accept the proposition that the amendment was not intended to include that which it especially mentions in terms unmistakable to the common understanding. Nor do we think there is any merit in the point that the duty of canvassing the returns is not the official duty of the Secretary of State. By virtue of his office, he is one of three who constitute a board. Without his office, he could not act, and we think the part performed by him is an official act of the Secretary of State.

It remains to discuss the character of the charges made. The only duties of the Board of State Canvassers are to canvass the returns, and determine and certify the result, of elections. Theirs is the culminating act of the army of persons who have had to do with the receiving and counting, recording and transmitting, of the votes which signify the will of the people. Section 202 of Howell's Statutes makes it the duty of these officers to attend, and form the Board of State Canvassers. Their duties are specifically pointed out. The times when they are to meet are provided by law. *No provision is made for deputies or clerks,* but all go to show that this important duty is to be performed by them in person, as the certificate signed by them asserts. It is not confided to inferior officials, but to three of the State officers of greatest dignity and importance. It appears to have been the design of the lawmakers to place the votes of the people in the keeping of the most responsible officers of the State; and no argument ought to be necessary to show that it was not expected that the returns would, upon their arrival, be turned over to an irresponsible clerk in the secretary's office, having no official relation to the canvass, whose

tabulation should be the canvass, and that the mere signing of their three names to his production should constitute a full compliance on the part of these officers with the law prescribing the duties of the State canvassers. Section 207 requires an examination by the board of the several statements of the votes, and that *they* make a statement of the whole number of votes cast for each office, while section 209 makes it their duty to certify such statement to be correct. A mere failure to certify could be called "neglect." What shall be said of it when the certificate is made without knowledge of, or any attempt to ascertain, the fact? An officer is elected for two years. Who shall count and keep the money of the State, or keep its great seal, for a couple of years, is not a matter of vital importance; but an amendment of the Constitution changes, perhaps for all time, the fundamental law, releasing or reclaiming by the people some right or power over the Legislature and officers, the consequence of which may be stupendous. In the present instance, it was a matter of money,— several thousand dollars a year; and, while many may feel that the defeat of this amendment was unfortunate, it is vastly more unfortunate to have the will of the people thwarted, though it be the result of carelessness only, or neglect on the part of the board to perform *the only duty imposed upon them by law*. Looking at the circumstances from his official standpoint, the Governor may well have said this, though not willful, was only possible by reason of the grossest neglect of official duty. It certainly was some one's duty to move at once with a view to the correction of the error, and the prevention of its recurrence.

While there is an inclination upon the part of the average American to accept good intentions as an excuse for mistakes, it is not for the general public good that responsible public offices shall be confided to, or remain in the custody of, those whose duties and responsibilities

rest so lightly upon them as to permit the public interests to be injured or endangered through neglect; and when such neglect, from the gravity of the case, or the frequency of the instances, becomes so serious in its character as to endanger or threaten the public welfare, it is gross, within the meaning of the law, and justifies the interference of the executive, upon whom is placed, by this amendment, the responsibility of keeping the affairs of State in a proper condition. We cannot think that the term "gross neglect" means only intentional official wrongdoing. Such acts would hardly be described by the word "neglect."

It is said that this section confides great power to the Governor. This is true; but the governorship is an exalted office,—one which ought to carry with it a presumption of integrity of character and breadth of mind commensurate to its importance. It would be a sad commentary upon free government if it were otherwise. But the powers of the Governor are carefully restricted, and there is no occasion to pursue the illusive phantoms of possibility. When abuses arise, they will doubtless be speedily and effectively met.

It remains to notice the sixth objection raised. It is as follows:

"The notice served on respondents is void because it is not 'In the Name of the People of the State of Michigan,' as required by section 35 of article 6 of the Constitution, and it is not authenticated by the great seal of the State, as required by section 18 of article 5 of the Constitution."

It is enough to say that section 35, art. 6, applies to the judicial department only, while the other provision (section 18, art. 5) certainly ought not to apply to a case where the Governor is citing the custodian of the great seal before him upon charges. But such citation is not such an official act as needs authentication. It has no import-

ance, and is of no personal interest to others than those cited, and falls within the multitude of daily acts, which, while official in a sense, do not require authentication by the great seal.

The demurrer must be overruled, and judgment of ouster entered against the respondent.

The other Justices concurred.