STATE OF NORTH DAKOTA EX REL. W. S. SHAW, Petitioner, v. LYNN J. FRAZIER, as Governor of the State of North Dakota, and L. J. Wehe, Respondents.

(167 N. W. 510.)

**Governor — power of — to remove certain public officers — statutes — constitutionality.**

1. Sections 685 to 695 of the Compiled Laws of 1913, which vest in the governor the power to remove certain public officers for malfeasance in office and

disregard of official duty, are constitutional, and do not violate § 85 of the Constitution of North Dakota, which vests the judicial power in the supreme and other courts.

**Public officer — removal by governor — malfeasance — disregard of public duty — statute — definite — district court — appeal to — from order — trial de novo.**

2. Section 690 of the Compiled Laws of 1913, which provides for an appeal to the district court in cases where a removal of a public officer is sought, is sufficiently definite to provide for a legal appeal and for a trial *de novo* in such court.

**Cities and villages — creatures of statute — Constitution — no restriction upon legislation — for removal of officials — courts — powers of — not exclusive.**

3. Cities and villages are creatures of the statute, and no specific restriction is found in the Constitution upon legislative action in relation to the removal of their public officers, or which places that power exclusively in the courts.

**City commissioners — board of — president of — office of — right of — not a private right.**

4. The right of a person to the office of president of a board of city commissioners is not a private right.

**Officer — removal — power — generally in courts — grant of — to some other branch of government — may be made by legislature — delegation of power.**

5. Although the power to remove from office is generally regarded as a power which is possessed by the courts, in the absence of an express or implied grant to some other authority in the government, this power may be exercised by the legislature or may be delegated by the legislature to some other authority.

**Power to remove administrative — exercised in judicial manner — "due process of law" — officers are agents of state — state may investigate acts — may make legislative provision for.**

6. The power to remove from office is administrative rather than judicial, although it should be exercised in a judicial manner, and the state is not so bound by the term, "due process of law," that it is impossible for it to investigate its agents without subjecting itself as far as their removal is concerned to the delays and uncertainties of strict judicial action.

**Officers — board of city commissioners — president of — creation of — legislature — not by Constitution.**

7. The case of Ex parte Corliss, 16 N. D. 417, examined and *held* not to apply to officers, such as the presidents of city commissions whose offices are not provided for or embedded in the Constitution.

**Writ of prohibition — inferior court or tribunal — jurisdiction of — when existing — writ will not lie.**

8. The writ of prohibition will not lie when the inferior court or tribunal has jurisdiction nor will it lie to prevent a subordinate court from deciding erroneously or from enforcing an erroneous judgment in a case which it has the right to adjudicate.

**Local self-government — statute — not infringed upon by — removal of mayors — police officers — governor.**

9. No right of local self-government is infringed upon by § 685 of the Compiled Laws of 1913, which provides for the removal by the governor of municipal mayors and police officers.

**Cities and villages — officers — removal of — by governor — appeal — place of hearing — statutory provisions — constitutionality.**

10. Sections 685 to 695 of the Compiled Laws of 1913, which provide, among other things, for the removal of the officers of cities and villages for malfeasance in office or disregard of official duty, are not unconstitutional for the reason that the appeal from action of the governor which is provided for is required to be tried in some county other than that of the residence of the defendant.

**City board of commissioners — president of — office of — created by legislature — private right — duties of office — one accepts subject to.**

11. The office of president of a board of city commissioners is created by the legislature, and the holding of it is not based upon any personal or primary rights. When an official is elected he accepts office subject to the duties which are placed upon him and subject to removal under §§ 685 to 695 of the Compiled Laws of 1913.

**City commission — president of — subject to removal — by governor — recall statute — not affected by — remedies — cumulative — statute.**

12 The right of the governor to remove the president of a city commission for malfeasance in office or for disregard of official duty under §§ 685 to 695 of the Compiled Laws of 1913 is not restricted by § 3835 of the Compiled Laws of 1913, which provides for the recall of such city officers. The two remedies are cumulative.

**Words, "other police officer" — president city commission — included in phrase.**

13. The words, "or other police officer," which are found in § 685 of the Compiled Laws of 1913, include the president of a board of city commissioners.

**Ejusdem generis — rule of — general words — application — persons or things enumerated — not limited to one — same in general.**

14. Under the rule of *ejusdem generis* the general words apply to persons or things contained within the general genus of the particular persons or things enumerated, and are not limited to any particular one.

**President of city commission — administrative police — is member of.**

15. The president of a board of city commissioners is a member of the administrative police of such city.

**Statute — words or titles of officers — "mayor" — includes president of city commissioners.**

16. The word "mayor," as used in § 685 of the Compiled Laws of 1913, includes the president of a board of city commissioners.

Opinion filed February 2, 1918.    Rehearing denied April 27, 1918.

Application for a writ of prohibition to restrain further proceedings in the removal of public officers.

Appeal from the District Court of Ward County, Honorable *A. T. Cole,* Special Judge.

Judgment denying writ and dismissing proceedings affirmed.

Statement of facts by BRUCE, Ch. J.

The petitioner, William Shaw, prays for a writ of prohibition which shall restrain the governor of the state of North Dakota from further proceedings in the suspension and removal of him, the said petitioner, from the office of president of the city commissioners of the city of Minot.

The charges which are made against the defendant petitioner and on which his removal is sought by the governor are as follows:

"That within the two years last past and prior to the commencement of these proceedings and while the said Shaw was president of the city, as aforesaid, the said W. S. Shaw, disregarding his duties as such officer, and in violation of the laws of the state of North Dakota and the ordinances of the city of Minot, knowingly permitted, allowed, and suffered numerous places within the city of Minot to be openly kept and maintained as places where intoxicating liquors were sold, bartered, and given away, in violation of chapter 83 of the Penal Code, Compiled Laws of North Dakota for 1913, and acts amendatory thereof, and in violation of the ordinances of the city of Minot, in which places persons were permitted to resort and did resort for the purpose of drinking intoxicating liquors as a beverage in violation of the laws of North Dakota and the ordinances of the city of Minot, and in which places intoxicating liquors were kept for sale, barter, exchange, and delivery

39 N. D.—28.

in violation of the laws, and did knowingly connive at the open and notorious maintenance of said places and did protect the proprietors and inmates thereof.

"That within the past two years and while said W. S. Shaw was president of the city commission of the city of Minot, as aforesaid, that both in violation of his duties and in disregard of the laws of the state of North Dakota and of the ordinances of the city of Minot, knowingly and corruptly allowed and suffered to be kept and maintained within the said city of Minot numerous places as bawdyhouses, and connived at the open and notorious maintenance of said places, and protected and shielded the owners and inmates thereof.

"That within the past two years and while said W. S. Shaw was president of the city Commission of the city of Minot, as aforesaid, said defendant, in violation of the laws of the state of North Dakota and the ordinances of the city of Minot, knowingly permitted, allowed, and suffered to be openly and notoriously kept and maintained in the city of Minot numerous places for gambling, where tables, cards, dice, and other gambling apparatus were kept and maintained, and where persons were permitted to resort for gambling, and where games of chance on which money and property were wagered and where persons did resort for gambling, and did knowingly and wrongfully connive at the maintenance of said places and did protect the proprietors and inmates thereof."

"Relator and complainant further alleges and shows that the said W. S. Shaw, an official of the city of Minot, as aforesaid, has been and still is a member of a club, to wit, the Elk's Lodge, in the city of Minot, within the two years last past, which up until on or about the 7th day of May, 1917, assembled together in a place in said city, known as the Elk's Home, for the purpose of drinking intoxicating liquors, and that defendant at the time above set forth and up to the 7th day of May, 1917, visited said premises where said club was maintained and where intoxicating liquors were sold as a beverage in violation of the laws of the state of North Dakota, and then and there did drink intoxicating liquors in said place on many occasions, and did then and there participate in the operation of said club in the illegal sale and disposition of intoxicating liquors,—all in the violation of chapter 83, Penal Code, Compiled Laws of North Dakota for 1913, and acts amendatory there-

to, and particularly in violation of §§ 10,122 and 10,123, Compiled Laws of North Dakota for 1913,—all to the public defiance of law and to the general promotion of disrespect for law and in violation of his official oath.

"Relator and complainant further alleges and shows that during the two years past the said W. S. Shaw, an official in the city of Minot, as aforesaid, did wilfully and unlawfully conspire with other officials of the city of Minot and county of Ward, and other private persons, for the perversion and obstruction of justice and against the due administration of the law.

"Relator and complainant further alleges and states that, within the two years last past and up to the time of the commencement of this action, the said W. S. Shaw, an official of the city of Minot, as aforesaid, did have knowledge of the violation of the Prohibition, Gambling, and Bawdyhouse Laws, and other laws of the state of North Dakota, and of the violation of the ordinances of the city of Minot covering the same offenses within the city of Minot, and that defendant has wilfully and wrongfully refused, failed, and neglected to take official action to enforce such laws, but, on the contrary, wilfully and in a grossly incompetent manner has permitted all of said laws to be violated and continually, and has refused to take official action to enforce said laws and ordinances upon repeated complaints made to defendant by citizens of Minot, as to the conditions existing in said city during said time."

The principal provisions of the statutes under which the removal is sought are as follows:

Section 685, Compiled Laws of 1913: "The governor may remove from office any county commissioner, clerk of the district court, county judge, sheriff, coroner, county auditor, register of deeds, state's attorney, county treasurer, superintendent of schools, county commissioners, surveyor, public administrator, mayor, chief of police, deputy sheriff or other police officer, or any custodian of public moneys, except the state treasurer, whenever it appears to him by competent evidence and after a hearing as hereinafter provided, that such officer has been guilty of misconduct, malfeasance, crime in office, or for habitual drunkenness or gross incompetency."

Section 686, Compiled Laws of 1913: "The complaint or charges against any such official authorized to be removed by the governor shall

be entitled in the name of the state of North Dakota and shall be filed with the governor. It may be made on the relation of any five qualified electors of the county in which the person charged is an officer or the state's attorney of such county, and such complaint or charges shall be filed by the attorney general when directed so to do by the governor. When the officer sought to be removed is one other than the state's attorney, it shall be the duty of the state's attorney to appear and prosecute, and when proceedings are brought to remove the state's attorney the governor shall request the attorney general or some other competent attorney to appear on behalf of the state and prosecute such proceedings."

Section 687, Compiled Laws of 1913: "The complaint or charges shall state the charges against the accused, and unless filed by the state's attorney or attorney general shall be verified, and may be amended as in ordinary actions; provided, that if such amendment of the complaint or charges include any new or additional charge, then a reasonable time should be allowed the accused to prepare his defense thereto."

Section 688, Compiled Laws of 1913: "Whenever charges are made against any such officer, the governor shall appoint a special commissioner to take and report the testimony for and against the accused, to be used on the hearing. Such testimony shall be reduced to writing and each witness shall subscribe his name to his testimony, when same is so reduced, and the governor in his discretion may, if in his judgment the best interests of the state shall require it to be done, by written order to be delivered to such officer suspend such accused officer from the performance of duty during the pendency of the hearing. If the governor shall so suspend the accused he shall immediately notify the board or persons authorized to fill a vacancy in such office and thereupon such board or person shall, within five days after receipt of such notice, appoint some competent person to fill such office and perform the duties thereof *ad interim.*"

Section 690, Compiled Laws of 1913: "Whenever testimony has been taken upon charges filed against any officer, as hereinbefore provided, it shall be the duty of the special commissioner to forthwith report all such testimony to the governor and file the same in his office, and thereupon the governor shall fix a time and place for hearing on

a day not more than ten days from the date of the filing of the commissioner's report, and not less than five days from the date of the service of notice of such hearing upon the accused at which hearing the accused shall be entitled to be heard in person or by attorney. If upon the hearing the charges are sustained, the governor shall forthwith make his order in writing, removing such officer from his office and cause a copy of such order to be delivered to the accused and one copy to be delivered to the board or person having authority to fill a vacancy in such office, and thereupon such board or person shall, within five days thereafter, appoint some competent person to fill such office and perform the duties thereof, unless the accused had, prior to the final hearing, been suspended as hereinabove provided, and an *ad interim* appointment made. In such case the person appointed to such office *ad interim* shall continue until the expiration of the term for which the accused had been elected or appointed; provided, however, that in all cases where the accused person so removed deems himself aggrieved thereby, he shall be entitled to appeal from the decision of removal so made by the governor to any district court in this state upon filing a notice of appeal therefrom in the office of the secretary of state within fifteen days after the date thereof. Such notice to set forth the grounds of appeal and thereupon such accused person shall be entitled to a trial *de novo* in such court as now provided by law, provided, that such trial be not held in the county wherein the accused resides."

In support of his petition the petitioner contends:

(1) That the statute (§ 685 of the Compiled Laws of 1913) does not apply to the presidents of city commissions.

(2) That the moving papers which were filed with the governor are insufficient to invoke the power of removal.

(3) That §§ 685 et seq., under which the removal is sought, are unconstitutional for the reasons (a) that they confer judicial powers upon the governor and in this respect violate § 85 of the Constitution; (b) that they deny due process of law in that they provide for no appeal, or, at any rate, for an appeal that is insufficient and abortive and defective in the prescribed statutory procedure; (c) that the provision for an appeal and a trial *de novo* provides for a trial outside of the county in which the official resides, and not only denies the petitioner the right to a trial in his county and vicinage, but, on account of the

added expense of such a trial, amounts to a denial of a resort to the courts and therefore violates §§ 22 and 24 of the state Constitution.

*McGee & Goss,* for petitioner.

The office of president of a city board of commissioners is not included in or covered by the statute authorizing the governor to remove from office, for stated reasons, any of the officers there named. Code, § 685.

The statute is plain and definite, and the rule of construction is as follows: "It is a very well-settled rule that, so long as the language used is unambiguous, a departure from its natural meaning is not justified by any consideration of its consequences or of public policy, and it is the plain duty of the court to give it force and effect." 36 Cyc. 1106, 1108, 1114, 1115; 162 Fed. 331, 340, 95 C. C. A. 615; 170 Fed. 529.

"An express mention is an implied exclusion." The mention in the statute by name of all the officers subject to removal as stated, by the governor, must be construed to exclude all other officers. 36 Cyc. 1132, 1137.

In the use of the word "Mayor" in the act, the legislature did not intend to include therein the president of a board of city commissioners.

"An act is not *in pari materia* though it may incidentally refer to the same subject, if its scope and aim are distinct and unconnected." Code, § 685; 4 Words & Phrases, 3478; People v. New York C. R. Co. 25 Barb. 199; Waterford v. People, 9 Barb. 161; Wheelock v. Myers, 64 Kan. 47, 67 Pac. 632; 36 Cyc. 1147.

Removal statutes are penal in their nature and operation. They should not be stretched by judicial interpretation to cover offices not plainly within their terms for such reason. Such statutes are always refused application where the subject-matter is not within both the letter and the spirit of the statute. Minnehaha Co. v. Thorn (S. D.) 61 N. W. 688; State ex rel. v. Donohue, 135 N. W. 1030; State v. Roth, 144 N. W. 339; Myrick v. McCabe, 5 N. D. 422; State v. Borstad, 27 N. D. 533; State ex rel. v. Therrin (Mich.) 45 N. W. 78; McLaughlin v. Burroughs Bros. Atty. (Mich.) 51 N. W. 283; Dullam v. Wilson (Mich.) 19 N. W. 112; Hollman v. Yoe (Kan.) 58 Pac. 802; State ex rel. v. Meek (Iowa) 127 N. W. 1023; State ex rel.

Hickman v. Alcorn (Tex.) 14 S. W. 663; Smith v. Ling, 68 Cal. 324, 9 Pac. 171; State v. Preston, 34 Wis. 675; State ex rel. v. McGovern (Wis.) 142 N. W. 595.

The rule of construction of penal statute is well settled. "If a penal statute of this state contains a patent ambiguity and admits of two equally reasonable and contradictory constructions, that which operates in favor of the party accused under its provisions is to be preferred." State v. Fargo Bottling Works, 124 N. D. 387.

"A court cannot create a penalty by construction, but must avoid it by construction, unless it is brought within the necessary meaning of the act creating it." 3 L.R.A. 924; State v. Fargo Bottling Works, 124 N. W. 387.

The office of president of a board of city commissioners is excluded under the rule, *Ejusdem generis*. This officer was left to removal by and under the recall act. "Other police officers" means officers of like kind, degree, and station to those with whom the term or phrase is coupled. Code, § 685; 36 Cyc. 1119; Re Barre Water Co. (Vt.) 9 L.R.A. 195; Rhone v. Loomis (Minn.) 77 N. W. 31; 17 Am. & Eng. Enc. Law, 278.

When charges are once filed there is no authority vested in the governor, the referee, or other prosecuting officer to amend them by making them more specific. People ex rel. Metevier v. Therrien (Mich.) 45 N. W. 78.

In all such cases the statute must be strictly followed in the first instance, and defective charges cannot be supplemented by the prosecuting attorney or other official conducting the inquiry. MacLaughlin v. Burrows (Mich.) 51 N. W. 283; Dullam v. Wilson, 53 Mich. 393, 19 N. W. 112; Metevier v. Therrien, 80 Mich. 188, 45 N. W. 78; Hoffman v. Yoe, 58 Pac. 802; State ex rel. Barker v. Meek, 127 N. W. 1023; State v. Willing, 129 Iowa, 72, 105 N. W. 355; Wass v. Stephens, 128 N. Y. 123, 28 N. E. 21; State v. Preston, 34 Wis. 675; Com. v. Kneeland, 20 Pick. 220; Shaver v. Ingham, 58 Mich. 654, 55 Am. St. Rep. 712, 26 N. W. 162; Harrison v. State, 37 L.R.A. 154; Felton v. U. S. 96 U. S. 699, 24 L. ed. 875; Evans v. United States, 153 U. S 584, 38 L. ed. 830; Spurr v. N. W. 174 U. S. 728, 43 L. ed. 150; State v. Grassle, 74 Mo. App. 316; Tripplett v. Munter, 50 Cal. 644; Smith v. Ling, 68 Cal. 324, 9 Pac. 171; State v. Alcorn, 78 Tex.

387, 14 S. W. 663; State v. Scates, 43 Kan. 330, 23 Pac. 479; State v. Bourgeiois (La.) 14 So. 28; Ponting v. Isman, 7 Idaho, 581, 65 Pac. 434; State v. Roth, 144 N. W. 369; Ekern v. McGovern, 142 N. W. 595.

The charges here are too indefinite and evasive and uncertain. The primary requisite of a judicial hearing is that the accused shall be informed of what he is to meet and definitely of the person, time, and place, in order that he may properly prepare his proof and defense. State ex rel. Ekern v. McGovern (Wis.) 142 N. W. 545.

The statute in question is unconstitutional because it attempts to delegate judicial powers to other branches of government. 40 Am. St. Rep. 29; 5 R. C. L. 263; State ex rel. v. Blaisdell, 22 N. D. 86, 132 N. W. 869; State ex rel. v. Budge, 14 N. D. 532; Glaspel v. Jamestown, 11 N. D. 86; Bowman v. Silfer, 25 Pa. 28; Page v. Hardin, 8 B. Mon. 672; State v. Pritchard, 36 N. J. L. 101; Territory v. Cox, 6 Dak. 501; Eckern v. McGoveren (Wis.) 142 N. W. 595; State ex rel. Kinsella v. Eberhart (Minn.) 133 N. W. 857; State v. Peterson, 50 Minn. 239, 52 N. W. 655; Danohue v. County, 100 Ill. 94; State ex rel. Young v. Brill, 111 N. W. 639; McDermott v. Dinnie, 6 N. D. 278.

The remedy here is by writ of prohibition.

True the rule is that where this writ or remedy will later on be available in due course, objection to jurisdiction should first be made in the tribunal acting in excess of jurisdiction, to the end that the objection may be sustained and render the writ unnecessary. But such rule has its exception, and this case comes within the exception. Here the referee would have no power to act upon or sustain such objection, but, under the mandate of his appointing power, must proceed until the inquiry is finished. Charleston v. Littlepage, 51 L.R.A. 353, 80 S. E. 121; State v. Wear (Mo.) 33 L.R.A. 341; Board v. Holt, 51 W. Va. 435, 41 S. E. 337; Swinborn v. Smith, 15 W. Va. 483; Hein v. Smith, 13 W. Va. 358; Culpepper v. Gorrell, 20 Gratt. 484; note in 135 Am. St. Rep. 258, 260; State v. District Ct. (Mont.) 56 Pac. 216; Ex parte Yount, 209 U. S. 123, 52 L. ed. 714; 10 Mod. Am. Law 579.

Relief in this class of cases lies irrespective of the official interested. State ex rel. Kinsella v. Eberhart (Minn.) 133 N. W. 857; Ekrem v. McGovern (Wis.) 142 N. W. 595.

*William Langer,* Attorney General, *H. A. Bronson,* Assistant Attorney General, *D. V. Brennan,* Assistant Attorney General, *O. B. Herigstad,* State's Attorney, *R. A. Nestos,* Assistant State's Attorney, for respondents.

The statute here under consideration is entirely adequate to sustain the action of the governor in removing the president of a city commission; that the word "mayor" as used in said statute includes the "president of a city commission;" that his duties as an "officer" and as "custodian of public funds" are the same in effect as those of a mayor. Laws 1911, chap. 77, §§ 63, 64; Laws 1907, chap. 45, §§ 63, 64; Comp. Laws 1913, §§ 685, 3833, 3834.

This method of removal of public officials as provided by this law is merely cumulative to the methods previously existing. The law governing cities under the council system, wherever it relates to the duties of a mayor is given a blanket application to the duties of the president of a city commission. Comp. Laws 1913, §§ 3577, 3835, 9744, 10,334, 10,468, 10,482; Sess. Laws 1913, chap. 29.

One of the great duties of a mayor is to see to it that all laws and ordinances are enforced. The same is true of a president of a city commission. Under the counsel system the mayor is the chief executive officer; under the commission form the president occupies the same position. Code, §§ 3795, 3796.

He is also a peace officer the same as a mayor. Code, §§ 3571, 3573, 3833, 3834, 10,364; Smith, Sheriffs, Coroners & Constables, p. 42; (Wis.) 120 N. W. 862; 107 Pac. 508; 59 Hun, 107; Black's Dict. 906.

"The writ of prohibition will not issue on account of errors or irregularities in the proceedings of a court having jurisdiction, or on account of insufficiency of averment or pleading, or upon matters of defense which may be properly raised in the lower court." 16 Enc. Pl. & Pr. 1126, and cases cited.

The law here in question is constitutional. It must be noted that nowhere in the Constitution or in the Code is there anything which negatives the power of removal, either in the courts or executive officers. There is no prohibition contained in the Constitution or statutes against the removal or suspension of city officers or the president of a city commission. All officers not liable to impeachment shall be subject to removal for misconduct, malfeasance, crime, or misdemeanor in office or

for habitual drunkenness or gross incompetency in such manner as may be provided by law." Const. § 197; Comp. Laws 1913, §§ 3808, 10,334, 10,467–10,482.

The removal of an officer by the governor is not an act of punishment or for such purpose, but is designed to protect the people—the public— against abuse of power, and the legislature has the power to prescribe the method and machinery to be employed in removal cases. (Minn.) 52 N. W. 655; (N. Y.) 64 N. E. 451.

Such acts of removal are not judicial but are the exercise of administrative powers in a judicial manner. 29 Cyc. 1371; (Idaho) 36 Pac. 502; (Okla.) 28 Pac. 14; (Wis.) 122 N. W. 748; 67 S. E. 861; 10 Am. Dig. 1447; 5 N. E. 228; (Kan.) 42 Pac. 697; 4 Decen. Dig. Const. Law; (Mich.) 57 N. W. 33.

The law does not impinge upon any legal right of self-government. 139 N. W. 88; Comp. Laws 1913, § 685; Const. § 194; 52 N. W. 655.

The removal law provides definitely for appeal and protects the official affected in all his civil rights.

It was within the power of the legislature to enact such law, and the law does not contravene the provisions against depriving a man of life, liberty, or property without due process of law. 99 Mich. 358, 41 Am. St. Rep. 606.

The power of removal implies the power to suspend. Throop, Pub. Off. 403.

The provision contained in the law for appeal from the governor's ruling, to the effect that "the appeal shall not be held where the accused resides," is not unconstitutional, nor does it abridge any personal or private right.

The right of the accused to a trial within the county of his residence is not a constitutional right, and the prosecution, upon proper motion, may change the place of trial to another county; that being true, the legislature, in a proceeding over which it is given complete control by the Constitution, has the right to fix the place of any trial or hearing on such appeal. Barry v. Traux, 13 N. D. 131; Const. § 109; 2 Enc. Pl. & Pr. 16.

The petitioner had other plain, speedy, and adequate remedies at law which negative jurisdiction on the part of this court to grant the writ.

The most fundamental rule existing in regard to the issuance of a

writ of prohibition is that the petitioner must have first exhausted his remedies in the lower court or tribunal, or before the person sought to be restrained, especially in the way of objections to the jurisdiction of the governor or referee, and should show that such objections have been overruled. No such objections have ever been made in these proceedings. 32 Cyc. 824 and cases cited; 16 Enc. Pl. & Pr. 1128, 1130 and cases cited.

BRUCE, Ch. J. (after stating the facts as above). The first question to be determined is whether §§ 685 to 695 of the Compiled Laws of 1913 are unconstitutional for the reason that they delegate to the governor judicial powers and are in violation of § 85 of the Constitution, which provides that "the judicial power of the state of North Dakota shall be vested in a supreme court, district courts, county courts, justices of the peace, and in such other courts as may be created by law for cities, incorporated towns and villages."

We think they are not. In the first place not only do the statutes provide for the taking of testimony and for a full hearing before the governor, but for an appeal to the courts and a trial *de novo* also. See § 690.

Section 690, while not perhaps as complete and detailed in its provisions as it might be, is nevertheless sufficiently definite to provide for a legal appeal and for a trial *de novo* in the district court in the manner followed in the cases of appeals from justices and county courts where a trial *de novo* is asked, that is to say, in the same general manner "as actions originally commenced" in the district courts. See §§ 8620 and 9172, Comp. Laws 1913.

This certainly amounts to due process of law.

In the second place the Constitution expressly provides:

Section 197. "All officers not liable to impeachment shall be subject to removal for misconduct, malfeasance, crime or misdemeanor in office or for habitual drunkenness or gross incompetency in such manner as may be provided by law."

Section 130. "The legislative assembly shall provide by general law for the organization of municipal corporations, restricting their powers as to levying taxes, etc."

This latter provision has been construed in Glaspwell v. Jamestown,

11 N. D. 86, 88 N. W. 1023, and State ex rel. Johnson v. Clark, 21 N. D. 517, 131 N. W. 715, as not merely conferring upon the legislature the power to create, but the power to control the government of, cities and villages. Cities and villages, in short, are creatures of the statute and of the statute alone; no specific restriction is found in the Constitution in relation thereto, and those therefore only apply which are general in their application, such as that which forbids the deprivation of liberty or property without due process of law, or § 85, which confines in the courts the exercise of the judicial power. Nowhere is there in the Constitution anything which prohibits the removal of city officers or which places that power exclusively in the courts.

We are here dealing with departments of government, and not with mere private rights. Atty. Gen. ex rel. Rich v. Jochim, 99 Mich. 358, 367, 23 L.R.A. 699, 41 Am. St. Rep. 606, 58 N. W. 611. Section 130 of the Constitution, which confers upon the legislature the power to provide for the organization of municipal corporations, in no way limits that power except in the matter of levying taxes, borrowing money, and contracting debts. The legislature was given the power to provide any method of government it chose or for any method of selecting officers. It could have provided for the appointment of municipal officers by the governor alone. There is nothing in the provision that prevents the legislature from providing for the election of such officers and the holding of their offices subject to the governor's right of removal.

While the power to remove from office is generally regarded as a power possessed by the courts, in the absence of an express or implied grant to another authority in the government, this power may be exercised by the legislature or may be delegated by the legislature to some other authority. 28 Cyc. 433; 29 Cyc. 1371; Rankin v. Jauman, 4 Idaho, 53, 36 Pac. 502; State ex rel. Clapp v. Peterson, 50 Minn. 239, 52 N. W. 655.

It is generally held that the power of removal from office is not a judicial but an administrative power, though it should be exercised in a judicial manner. The exigencies of the government often require the prompt removal of corrupt or unfaithful officers, and, such being the case, the legislature has the power to provide for removal. Rankin v. Jauman, 4 Idaho, 53, 36 Pac. 502; Re Guden, 171 N. Y. 529, 64 N. E. 451; Cameron v. Parker, 2 Okla. 277, 38 Pac. 14; State ex rel.

Wagnor v. Dahl, 140 Wis. 301, 122 N. W. 748; State v. Borsted, 27 N. D. 533, 147 N. W. 380, Ann. Cas. 1916B, 1014.

The state indeed "is not so bound by the term, 'due process of law,' that it is impossible for it to investigate its agents without subjecting itself, so far as their removal is concerned, to the delays and uncertainties of strict judicial action." Atty. Gen. ex rel. Rich v. Jochim, 99 Mich. 358, 23 L.R.A. 699, 41 Am. St. Rep. 606, 58 N. W. 611; State v. Borsted, 27 N. D. 533, 147 N. W. 380, Ann. Cas. 1916B, 1014.

The same considerations apply to the objection that, although § 690 provides for an appeal and a trial *de novo,* it denies that trial in the particular county of the official's residence.

As we have before pointed out, the matter is administrative rather than judicial, and involves the right to a public office rather than private property rights. Atty. Gen. ex rel. Rich v. Jochim, supra. It is also to be remembered that in the case of Barry v. Traux, 13 N. D. 131, 65 L.R.A. 762, 112 Am. St. Rep. 662, 99 N. W. 769, 3 Ann. Cas. 191, we held that the right to a trial by a jury in the county of one's own residence is not unconditional, but is always subject to the exception that the case may be removed either upon the application of the prosecution or the defendant when necessary to secure a fair and impartial trial. It was evidently the feeling of the legislature that in matters such as that before us an impartial trial could not be held in the county of residence on account of the political feeling which must necessarily there exist.

The case is not one where a jury is guaranteed by the Constitution. Although the right to an office often involves property, it is not strictly a property right. See Atty. Gen. ex rel. Rich v. Jochim, supra. The office is created by the legislature, and the holding of it is not based on any personal or primary rights. When the petitioner was elected he accepted the office subject to the limitations which were placed thereon and subject to the method of removal which the statute provided. It is also to be noted that the defendant, though denied the right to a trial in his own county, may select any other that he chooses.

Nor does the fact that § 3835 of the Compiled Laws of 1913, which was passed as chapter 67 of the Laws of 1911 and chapter 29 of the Laws of 1913, provides for a popular recall of city commissioners, alter the situation. At the most two remedies are afforded the public

for the malfeasance of its officers,—one is speedy, administrative, and peremptory, and the other is popular, cumbersome, and more or less dilatory.

The grounds of relief, too, are entirely different, and that afforded by § 38 of chapter 45 of the Laws of 1907, which provides for recall, is much more comprehensive than that afforded by chapter 685 of the Compiled Laws of 1913. Section 65 of the Compiled Laws of 1913 merely provides for a removal in the case of "misconduct, malfeasance, crime in office, habitual drunkenness, or gross incompetency," that is to say, for direct wrongdoing or gross incompetency. Section 3835 of the Compiled Laws of 1913 requires no reason to be given, and merely provides that "the holder of any elective office in cities which may adopt or have adopted the commission plan of government under any of the laws of this state applicable thereto may be removed at any time by the electors qualified to vote for a successor of such incumbent."

Under this act all that is necessary is a petition for removal, and no fault or crime or kind of malfeasance need be specified or mentioned. It is clear that under it persons may be removed for political fault merely, and, in fact, without any fault. Its intention was clearly to retain in the people the political control over their city officers and the control of the legislative policies of such officers.

Its enactment was due to the fact that the commission form of government removed city officers in a measure from the direct control of their wards and constituencies, and that the legislature feared that in certain instances such officers might adopt policies of government and of legislation which they might not approve.

The act in question also clearly provides that "this said method of removal shall be cumulative and additional to the methods heretofore provided by law." Though this provision uses the words, "heretofore provided by law," it also clearly expresses the intention that the method shall be cumulative. Even if it provided otherwise it would not be controlling upon the legislature of 1913, which passed the Removal Act which is before us, as it is elementary law that no legislature can tie the hands of its successors.

Nor is there any merit in the contention that the statutes before us interfere with the right of home rule and local self-government. These rights are often imaginary rather than real, and are all subject to con-

stitutional regulation and control. The legislature also may do practically anything which the Constitution does not forbid.

As we have before pointed out, cities are of legislative creation, and the power of the legislature to exercise control over them is conferred by the Constitution.

We are not unaware of the decision of this court in the case of Ex parte Corliss, 16 N. D. 470, 114 N. W. 962, but, as pointed out by us in the case of Runge v. Glerum, 37 N. D. 618, 164 N. W. 284, that case merely forbids interference with officers, such as sheriffs and district attorneys, whose offices are provided for and "embedded" in the Constitution, and does not in any manner hold it unlawful for the legislature to control officers and offices which are not of constitutional creation or the policies of cities which it alone has the power to create.

Nor is there any merit in the contention that the petition is indefinite, and that conclusions rather than facts are pleaded.

Even if the petition were defective in the particulars stated, and on this we express no opinion but rather incline to the contrary view, this is a writ of prohibition, and a writ of prohibition is only issued when an inferior court or tribunal is acting without jurisdiction. Where an inferior court has jurisdiction of the matter in controversy, prohibition will not lie. The writ does not lie to prevent a subordinate court from deciding erroneously or from enforcing an erroneous judgment in a case in which it has a right to adjudicate. 23 Am. & Eng. Enc. Law, 198, 200. There can be no doubt that the governor of North Dakota had jurisdiction in the matter which is before us.

This brings us to a consideration of the question whether § 685 of the Compiled Laws of 1913, under which the removal is sought to be effected, is in any event applicable to the president of a city commission. Does the word "mayor," which is used in the statute, include such an officer? Do the words, "or other police officers," also include him?

We are satisfied that the term, "or other police officers," does cover such an official. We realize that there is a contrary holding in the case of People v. Gregg, 59 Hun, 107, 13 N. Y. Supp. 114, 115. That case, however, was a criminal case, and all that the charter of the city provided was that "as the head of the police of the city he shall preserve peace and order therein." And all that the statute provided was that it should be unlawful for any police official in the several cities

of the state to be directly or indirectly interested in the sale of spirituous or malt liquors.

There was in the statute no enumeration of officers, and there was nothing in the charter or in the statute which specifically imposed any police duties on the mayor.

In our opinion § 685 of the Compiled Laws of 1913 expressly sets apart and enumerates as subject to its provisions all of what may be termed the administrative police officers of a city. The word "police" has been defined as "that species of superintendence by magistrates which has principally for its object the maintenance of public tranquility among the citizens. The officers who are appointed for this purpose are also called the police.

"The word 'police' has three significations. The first relates to the measures which are adopted to keep order, the laws and ordinances on cleanliness, health, the markets, etc. The second has for its object to procure to the authorities the means of detecting even the smallest attempts to commit crime, in order that the guilty may be arrested before their plans are carried into execution and delivered over to the justice of the country. The third comprehends the laws, ordinances, and other measures which require the citizens to exercise their rights in a particular form.

"Police has also been divided into administrative police, which has for its object to maintain constantly public order in every part of the general administration; and judiciary police, which is intended principally to prevent crimes by punishing the criminals. Its object is to punish crimes which the administrative police has not been able to prevent." Bouvier's Law Dict.

There is, in our minds, no doubt that the president of a city commission belongs to such administrative police body, and that he is included in the phrase, "mayor, chief of police, deputy, sheriff, or other police officers." We are cognizant of the rule known as *ejusdem generis,* and that "where general words follow the enumeration of particular classes of persons or things the general words will be construed as applicable only to persons or things of the same general nature or class as those enumerated. The particular words are presumed to describe certain species, and the general words to be used for the purpose of including other species of the same genus. The rule is based on the obvious rea-

son that, if the legislature had intended the general words to be used in their unrestricted sense, they would have made no mention of the particular classes. The words 'other' or 'any other' following the enumeration of the particular classes are therefore to be read as 'other such like,' and to include only others of like kind and character." 36 Cyc. 1119.

It is to be noticed, however, that this quotation, which undoubtedly expresses the law, speaks of particular classes, and not of any particular class, and it is clear that what the genus is must be determined by all which are mentioned.

It is also clear to us that the president of a city commission belongs to the genus and is therefore included within the term, "or other police officer." Though not in all of his powers and duties, identical with a mayor, he is certainly an officer of like kind and character. He is certainly a member of the administrative police.

Section 3833 of the Compiled Laws of 1913 provides that "whenever, in the laws not repealed by this act, the words 'town council, city council, or village board' appear, it shall mean board of city commissioners; the word 'mayor' or 'president' shall mean president of the board of city commissioners. Whenever the words 'city commissioner' are used in this chapter they shall be construed to mean and include village commissioners."

Section 3834 provides: "All the provisions of law now in force or which may hereafter be passed by the legislative assembly in relation to the powers, duties or privileges of the president of boards of trustees of towns or villages, or mayors of cities, are hereby granted to the president of the board of city commissioners, and except where inapplicable all the provisions of law now in force or hereafter passed by the legislative assembly in relation to the powers, duties or privileges of town or village trustees, or other municipal boards thereof, or the powers, duties or privileges of city councils are hereby granted to the board of city commissioners provided for in this chapter; provided, cities incorporated under this chapter shall for all purposes according to their respective population retain the classification otherwise provided by law."

Section 3795 provides that "the president of said board of commissioners shall be the executive officer of said city, and shall see that all the laws thereof are enforced."

39 N. D.—29.

Section 3796 provides: "Whenever the president of the board of city commissioners shall deem it necessary, in order to enforce the laws of the city, or to avert danger, or protect life or property, in case of a riot or any outbreak, or calamity or public disturbance, or when he has reason to fear any serious violation of law or order, or any outbreak, or any other danger to said city or the inhabitants thereof, he shall summon into service, as a special police force, all, or as many of the citizens as in his judgment and discretion may be necessary and proper; and summons may be by proclamation or order, addressed to the citizens generally or those of any ward of the city or subdivision thereof, or such summons may be by personal notification. Such special police, while in service, shall be subject to the orders of the president of the board of city commissioners, shall perform such duties as he may require, and shall have the same power while on duty as the regular police force of said city, and any person so summoned and failing to obey or appearing and failing to perform any duty that may be required by this chapter shall be fined in any sum not exceeding one hundred dollars."

. Section 3571 provides: "He [the mayor] may exercise within the city limits the powers conferred upon sheriffs to suppress disorder and keep the peace."

Section 3573 provides: "He [the mayor] shall perform all such duties as are or may be prescribed by law or by the city ordinances, and shall take care that the laws and ordinances are faithfully executed."

"Police," says Clark's Dictionary, on page 906, "is the function of that branch of the administrative machinery of the government which is charged with the preservation of public order and tranquility, promotion of public health, safety and morals, and the prevention and detection and punishment of crimes."

We are satisfied that the president of a city commission has such police powers, and that he is a member of the administrative branch of the city police. It may be, as suggested by counsel for the petitioner, that, under the commission form of government, there is a city police commissioner who in a large measure acts as a chief of police. It may also be true that appointments and removals are made by the commissioners as a whole rather than by the president of the commission, and

that formerly the appointments were made by the mayor with the consent of the council.

It is no doubt true that the president of a city commission has no veto power, and has not the control of legislation which was formerly possessed by the mayor. It may be that the president of a city commission has not the unlimited power to discharge employees and officers, but he has none the less imposed upon him the duty to enforce the laws even if he has not the power to make them. He has none the less the duty to see that all the police officers perform theirs.

He has the unlimited power to summon and control a special police force when such police force is necessary. He certainly has not the power to connive at a maladministration of the law.

This again leads us to a determination of the question (though the same is hardly necessary) whether the term "mayor" as used in § 685 of the Compiled Laws of 1913 includes the president of a city commission.

We are satisfied that it does. Section 3833 of the Compiled Laws of 1913 and a section of the very act which created the Commission form of government provides: "Whenever, in the laws not repealed by this act, the words, 'town council, city council, or village board,' appear, it shall mean board of city commissioners; the word 'mayor' or 'president' shall mean president of the board of city commissioners. Whenever the words 'city commissioners' are used in this chapter they shall be construed to mean and include village commissioners."

Section 3834 also provides: "All the provisions of law now in force or which may hereafter be passed by the legislative assembly in relation to the powers, duties or privileges of the president of boards of trustees of towns or villages or mayors of cities, are hereby granted to the president of the board of city commissioners, and except where inapplicable all the provisions of law now in force or hereafter passed by the legislative assembly in relation to the powers, duties or privileges of town or village trustees, or other municipal boards thereof, or the powers, duties or privileges of city councils are hereby granted to the board of city commissioners provided for in this chapter; provided, cities incorporated under this chapter shall for all purposes according to their respective population retain the classification otherwise provided by law."

It is true that § 3833 uses the words, "wherever in the laws not repealed by this act," and it is true that their section was first adopted in 1907, and that § 685, under which the removal was sought to be affected, was not passed until 1913. Section 3834 of the Compiled Laws of 1913 being § 64 of chapter 45 of the Laws of 1907, however, clearly expresses the intention that when the term "mayor" should be used thereafter it should be given the same significance as was given to it in § 3833 and in construing the statutes already enacted.

This is evidenced not merely by the statutes referred to, but by the fact that since the passage of the act which created the commission form of government in 1907 the legislature has almost uniformly adopted the practice of using the words, "mayor" and "city council," interchangeably, and in acts which relate clearly to the presidents of city commissions and to such commissioners. See § 2825, chap. 58, of the Laws of 1909; § 2826, chap. 58, of the Laws of 1909; § 26, chap. 92, of the Laws of 1907; § 1, chap. 49, of the Laws of 1909; § 1 chap. 55, of the Laws of 1909; § 2, chap. 56, of the Laws of 1909; § 1, chap. 69, of the Laws of 1911; § 2775, chap. 70, of the Laws of 1911; § 2776, chap. 70, of the Laws of 1911; chap. 71 of the Laws of 1911; chap. 69 of the Laws of 1911.

The judgment of the District Court is affirmed.

GRACE, J. I concur in the result.

CHRISTIANSON, J. (dissenting). It seems to me that the first question to be determined in this case is whether the statute authorizing removals by the governor includes the president of a city commission among the officers subject to such removal. And I am frank to confess that I have not found this question to be as simple or easy to solve as have some of my brethren. The great fundamental rule in construing statutes is to ascertain and give effect to the intention of the legislature. This intention must first be sought in the words and language employed, and where the meaning of the language used is plain there is no occasion to resort to other means of interpretation. And such language must be given effect by the courts, or they would be assuming legislative authority. 36 Cyc. 1106; Sutherland, Stat. Constr. § 237. It is only where the language of a statute has a doubtful meaning, or where its provisions are contradictory, or where an adherence to the strict letter

would lead to injustice or absurdity, that there is any room for judicial construction. 36 Cyc. 1107.

The statute authorizing the governor to remove certain officers does not specifically enumerate the president of a city commission, and the question is whether the legislature intended to and did include such officer in the terms, "mayor" or "other police officers." The statute in question was enacted by the legislative assembly in 1913. In the message of the retiring Governor Burke, delivered on January 8, 1913, he strongly recommended the enactment of such legislation. He called attention to the fact that each platform upon which he had been elected governor in 1908 and 1910 contained a plank in favor of such law, and that bills providing therefor had been introduced in the legislative sessions in 1907, 1909, and 1911. The reason urged by Governor Burke for the enactment of such Removal Statute was that the Constitution commanded the governor to enforce the laws of the state, and that the power to remove should be vested in the governor in order to enable him to carry out this constitutional command. In support of his argument, he referred to the power vested in the President of the United States and his duties under the Federal Constitution to see that "the other executive and administrative officers of the government faithfully perform their duties, which are prescribed by the statutes. See House Journal 1913, pp. 185–189. The law under consideration was enacted by the legislative assembly to which Governor Burke delivered this message. It was entitled "An Act Providing for the Removal of County, Township, Municipal and Other Officers." Laws 1913, chap. 132. The same legislative assembly, at the same session, and in fact on the same day, enacted another act "to provide for a means of removal of elective officers by the will of the people." This law applied to and authorized the removal of "the holder of any elective office in cities which may adopt or have adopted the commission plan of government," by the electors of such cities. Laws 1913, chap. 79.

It is true, the adoption of this latter method of removal did not necessarily signify any intention on the part of the legislature that this method should be exclusive, as the legislature might, if it desired, provide two methods of removal. But the significant fact still remains that the legislature at the same time considered and enacted two laws for the removal of public officers. It considered not only the methods

of removal to be employed, but the officers to which each of the methods of removal might be applied. It determined that certain officers should be subject to removal, and it enumerated such officers. As to one of the methods of removal, it specifically distinguished between the president of a city commission and the mayor of a city, by making the president removable by a vote of the electors and withholding such method of removal as applied to a mayor. It is stated in the majority opinion that the reasons which actuated the legislature in enacting the measure authorizing the removal of elective officers in a city having the commission form of government by a vote of the electors was "that the commission form of government removed the city officers, in a measure, from the direct control of their wards and constituencies, and that the legislature feared that in certain instances such officers might adopt policies of government and legislation of which they might not approve." This reason would apply equally and with even greater force to the mayor of a city, operating under the aldermanic form of government. Such mayor is elected by the electors of the city at large, and he has far greater power with respect to the administration of the city affairs and the shaping of its governmental policies than has the president of a city commission.

The laws of this state provide two different plans of city government. The first plan is the one generally adopted in this country. It is a complete copy in miniature of the government of the United States and of the state. The mayor is the chief executive officer, with no legislative power except that of veto. The city council constitutes the legislative department. The second plan is known as the commission plan. It originated in Galveston, Texas, after the great inundation in 1900. There are fundamental differences between the two systems. In discussing the two forms of city government, a well-known legal writer has said: "Its [the commission plan's] essential feature is to center responsibility, and render the officers directly accountable to the people by providing fewer head officers; and its chief merit, as claimed by its advocates, is that it simplifies municipal administration. It usually incorporates the referendum, initiative, and the recall. The names of candidates for office, who are few, are arranged alphabetically on the ballot, and emblems or devises and party names are forbidden. The officers are elected at large, and do not represent wards or districts, but

the entire local community. The work of municipal administration is apportioned among the commissioners (five is the usual number), each being the head of a department for which he is responsible. . . .

"The commission plan seems to have sprung from the conception that municipal government is merely a business question, and therefore it should be conducted in substantially the same manner as a large business corporation. That is, the conduct of the affairs of the local government should be assimilated as far as practical to the most efficiently managed private business. . . .

"Apart from the commission plan mentioned, the disposition to increase the powers of the mayor and thus center the responsibility upon this official appears to be the present idea in this country in municipal governmental development. The fundamental principle is that the office of mayor should be 'clothed with dignity and real authority,' and that he should have ample power to control fully the administration of all municipal affairs. In addition to the veto power, which is his chief agency in legislation, many thinkers and writers contend that he should have 'the sole right to appoint and the unrestricted power to suspend or remove subordinate officials or heads of departments.' . . .

"The idea of the autocratic mayor, which contemplates giving him all executive and administrative power and restricting the governing or legislative body, which may not be inaptly termed "the cure or kill remedy," while objectionable in some respects, appears in the opinion of many to offer the best solution of the municipal problem touching the selection of officers and the centering of responsibility." McQuillin, Mun. Corp. §§ 92, 93.

Speaking of the commission plan, a critical student of city government says: "The healthful kernel of this new movement is that it rests upon an abiding faith in the efficacy of public control. It places responsibility for good government exactly where it belongs, namely, on the people themselves, and makes necessary the development of a well-organized public opinion." Rowe, Problems of City Government, chap. 8, p. 190.

A reference to our statutes will show the aptness of these observations. The mayor appoints all the appointive officers of the city, including the city auditor, city assessor, city attorney, and chief of police. Comp. Laws 1913, §§ 3580-3612. He is also authorized to fill by

appointment any vacancy existing in the office of city treasurer. § 3631. He is also empowered to remove any appointive officer. § 3570. The president of the city commission has no such powers. Under the commission plan, the government is divided into departments. Each commissioner is elected by a majority vote of the commissioners to take charge of one department. One commissioner is known as "police and fire commissioner," and this commissioner has "under his special charge the enforcement of all police regulations of the city." Comp. Laws 1913, § 3794. The appointive officers, including policemen, of the city, are selected, not by the president of the city commission, but by a vote of the commissioners. § 3801. The power to remove the appointive officers is vested not in the president of the city commission, but in the commissioners. Comp. Laws 1913, § 3808. The mayor of the city has power to veto ordinances and resolutions passed by the city council. Comp. Laws 1913, §§ 3579–3596. The president of the commission has no right to veto. Comp. Laws 1913, § 3792.

Considerable importance is attached by the majority members to § 3796, Comp. Laws 1913. This section provides: *"Whenever the president of the board of city commissioners shall deem it necessary, in* order to enforce the laws of the city, or to avert danger, or protect life or property, in case of a riot or any outbreak, or calamity or public disturbance, or when he has reason to fear any serious violation of a law or order or any outbreak, or any other danger to said city or the inhabitants thereof, he shall summon into service, as a special police force, all, or as many of the citizens as in his judgment and discretion may be necessary and proper; . . . " This language speaks for itself. The powers conferred by this section upon the president of a city commission are for unusual occasions. It is interesting to note in this connection that the mayor of the city is authorized not only to call on the male inhabitants of the city to aid in enforcing the laws and ordinances, but may also call out the Militia to aid in suppressing riots or rather disorderly conduct, or to carry into effect any law or ordinance, subject only to the authority of the governor as commander in chief of the Militia. Comp. Laws 1913, § 3576. Manifestly § 3796 is not intended to and does not vest the president of the city commission with power to appoint policemen of the city except in cases of emergency, such as riot or other unusual disturbance, but

the power to appoint police ordinarily necessary in the government of the city is expressly reserved to and conferred upon the city commissioners.   Comp. Laws 1913, § 2801.

Reference is also made in the majority opinion to §§ 3833 and 3834, Comp. Laws 1913.   These sections were part of the act providing for the commission form of city government.   The act was entitled "An Act to Provide for a Commission Form of Government in Cities Which Shall Adopt the Provisions of This Act."   Manifestly many provisions, such as the levy of taxes and special assessments, and other statutory provisions relative to the administration of city affairs, would be equally applicable to either form of government.   The existing statutes, however, referred to the "mayor" and "city council."   Consequently, in order to avoid the necessity of · re-enacting these provisions as a part of the law providing for the commission form of government, or to avoid any doubt as to what provisions were applicable, the legislature said: "Whenever, in the laws not repealed by this act, the words, 'town council, city council, or village board.' appear, it shall mean board of city commissioners; the word 'mayor' or 'president' shall mean president of the board of city commissioners."   Whenever the words, "city commissioners," are used in this chapter they shall be construed to mean and include "village commissioners." Comp. Laws 1913, § 3833.   And "all the provisions of law now in force or which may hereafter be passed by the legislative assembly in relation to the powers, duties or privileges of the president of boards of trustees of towns or villages, or mayors of cities, are hereby granted to the president of the board of city commissioners, and except where inapplicable all the provisions of law now in force or hereafter passed by the legislative assembly in relation to the powers, duties or privileges of town or village trustees, or other municipal boards thereof, or the powers, duties or privileges of city councils are hereby granted to the board of city commissioners. . . . "   Comp. Laws 1913, § 3834. The legislature in enacting these provisions obviously had in mind only city government.   The sole purpose of these sections was to make applicable, as far as practicable, under the commission form of government, the general provisions of law applicable alike to both plans of city government.   These provisions should be applied for the purpose intended.   It should not be assumed that a subsequent legislature in-

tended to wrench them from their setting, and to apply them to a purpose wholly foreign to that for which they were enacted.

It has been said that "it is generally safe to reject an interpretation that does not naturally suggest itself to the mind of the casual reader, but is rather the result of a laborious effort to extract from a statute a meaning which it does not at first seem to convey." Ardmore Coal Co. v. Bevil, 10 C. C. A. 41; 27 U. S. App. 96, 61 Fed. 757; Shultis v. MacDougal, 162 Fed. 331, 340. The majority opinion demonstrates quite clearly that the interpretation placed upon § 685, Comp. Laws 1913, is not one which "naturally suggests itself." It is only by a laborious effort, and by applying terms contained in statutes passed by other legislative assemblies for wholly different purposes, that the majority is enabled to say that this section applies to the president of a city commission.

When we consider the fundamental differences between the two forms of city government; that the same legislature on the same day passed two removal measures; that one of those specifically authorized removal of a mayor by the governor, but was silent as to the president of a city commission, while the other expressly authorized the removal of the president of the city commission by the electors of the city, but did not authorize the removal of a mayor in this manner,—it seems to me that no one can say that the legislature intended to include the president of a city commission in the first removal measure.

In view of what I have said, it is unnecessary for me to express any opinion on the constitutional questions raised. But inasmuch as the majority members have found it necessary to consider this question, I deem it proper to say that I am of the opinion that the Removal Statute under consideration is constitutional. I am not prepared, however, to concur in the discussion of the constitutional questions in the majority opinion. Whether the legislature has power to authorize the removal of an elective officer by the governor without permitting such review is a question of grave importance and considerable doubt, and one upon which I express no opinion. The question is clearly not involved in this case, as the Removal Statute before us provides for a judicial review of all questions.

Some reference is made in the majority opinion to § 130 of the state Constitution, and it is intimated that this section confers upon

the legislative powers with respect to municipal corporations which it would not otherwise possess. I believe this reasoning to be unsound.

The section reads: "The legislative assembly shall provide by general law for the organization of municipal corporations, restricting their powers as to levying taxes and assessments, borrowing money and contracting debts, and money raised by taxation, loan or assessment for any purpose shall not be diverted to any other purpose except by authority of law."

Manifestly this section does not confer upon the legislature any power or authority to deal with municipal corporations which it would not possess under the grant of legislative power. On the contrary it is rather a limitation upon the general grant of legislative power. It is a declaration of a constitutional policy with respect to the legislation relating to municipal corporations which the legislature is commanded to enact.

No one doubts the legislative power by appropriate laws to create, dissolve, supervise, or direct the conduct of the affairs of municipal corporations. This power, however, is subject to the limitations found in the state and Federal Constitutions, and this court has not hesitated to adjudge invalid statutes relating to municipal corporations which violated the state Constitution.

Thus, in Glaspell v. Jamestown, 11 N. D. 86, 88 N. W. 1023, this court held that it was beyond the power of the legislature to authorize proceedings for changing the boundaries of cities to be instituted in the district courts, for the reason that the power exercised in changing such boundaries was legislative and consequently could not be vested in the courts. And in Plummer v. Borsheim, 8 N. D. 565, 80 N. W. 690, this court held invalid as an unreasonable and arbitrary classification a statute relating to the organization of school townships.

ROBINSON, J. (dissenting). This is an appeal from an order of the district court by Judge Cole, dismissing a writ restraining proceedings by the governor to remove W. S. Shaw from the office of president of the city commissioners of Minot. The defense is: (1) That the complaint does not state a cause for removal; (2) that the statute does not authorize a removal; (3) that the statute is not constitutional.

The statute reads thus: The governor may remove from office any

county commissioner, clerk of the district court, county judge, sheriff, coroner, county auditor, county treasurer, superintendent of schools, surveyor, public administrator, mayor, chief of police, deputy sheriff or other police officer, or any custodian of public moneys, except the state treasurer, whenever it appears to him by complaint and evidence and after hearing that such officer has been guilty of misconduct, malfeasance, crime in office, habitual drunkenness or gross incompetency. Laws 1913, chap. 132.

The complaint is in effect that as president of the city commissioner's, W. S. Shaw knowingly permitted to be kept numerous places in Minot, where intoxicating liquors were sold and given away, and that he permitted bawdyhouses, gambling houses, to be kept within the city; that he is a member of the Elks Lodge and visited the place known as the "Elks Home," where people assembled for the purpose of drinking intoxicating liquors, and that on many occasions he did there drink intoxicating liquors and participate with the club in the illegal sale of intoxicating liquors.

The same might be said of the mayor of St. Paul, Minneapolis, and nearly every other city. They all permit numerous things to be done which they cannot well prevent. They belong to clubs and may innocently participate in the doings of the clubs. The Lord knowingly permits the doing of such things and still he has an absolute power to prevent them. The clergy and some of the best men on earth do knowingly permit the doing of many things which by extra vigilance and self-sacrifice they might prevent. No facts are stated to show that Mr. Shaw is a bad or immoral man, or that he is a drunkard or that he is incompetent, or that he is not the choice of the voters of Minot. So far as the record shows, were he removed from office to-day, to-morrow or in a few days the people of Minot might re-elect him. If his recall is demanded by the citizens of Minot, they have a plain, speedy, and adequate remedy. They have only to file with the city auditor a proper petition demanding a recall and the election of a successor. Then the board of city commissioners must fix a date for holding such election. The person subject to removal may be a candidate; and the candidate receiving the highest number of votes is elected.

Aside from all that, there is a regular judicial procedure by which an officer may be removed for crime or malfeasance in office. 2. The

second point is on the words of the statute, that the governor may re-move any mayor, chief of police, deputy sheriff, or other police officer. It is contended that the president of the board is in reality a police officer, and that he comes within the spirit and reason of the act. The answer is that the statute is penal, and it must be given a strict construction so as to include only those who come within the letter of the act. If the legislature had intended to include city commissioners, the question should not have been left open to doubt or discussion. To have named them in the list of removable officers were as easy as to name the mayor and chief of police. But there was good reason for naming only such officers as are not subject to recall. Of course a city or any person who employs men may reserve or be given the right to recall or discharge them.

On the constitutional validity of the act, it is proper to consider what might be done under it or under similar acts. An office is property, it affords a living. It is an annuity. It is probable that the office in question gives an annuity of $1,000 a year. In some cities (not in this state) the head of a city commission is hired for his expertness and is paid from $5,000 to $10,000 a year. Now if a statute may authorize the governor or any other person in a summary manner to deprive any city commissioner of his annuity, why may he not in like manner under a similar statute deprive any person of his lands and possessions? Such was the power exercised by the great feudal lords. But now we have written constitutions, both state and Federal, which provide that no man shall be deprived of his property without due process of law. That includes and guarantees a hearing and a trial according to the law of the land and the established course of judicial procedure. By the constitution the judicial power of the state is vested in the courts. They alone are given jurisdiction to hear and determine matters of legal dispute regarding personal and property rights. When a charge is made that a person is guilty of misconduct in office and he denies the charge, then, to establish it and to deprive him of his office and his annuity, there must be a trial by some competent tribunal, the taking of testimony, deliberation, and determination. The tribunal must have jurisdiction, which means a right to speak and determine the law and the facts of the case. This power is judicial. It is given exclusively to the courts and it may not be given to the governor.

To obviate this objection, the statute gives a half-way appeal to the courts. It provides that when a party is accused, the governor may order a hearing before a referee, suspend the accused from his office, deny him his salary during the hearing, and cause the vacancy in his office to be filled by an appointment. That the accused may appeal to any district court from the final decision of removal. That is not due process of law. A party may not be harassed or executed by a mock trial before he is legally tried and convicted.

The case presents another feature which was considered in a case arising under a statute authorizing the governor to appoint a temperance commissioner to act in any county as a state's attorney in the prosecution of liquor cases. The act was held void. The court said: The constitutional method of local administration of laws cannot be changed by the legislative assembly because they are of opinion that the local officers will not honestly administer such duties. In adopting the Constitution the people decided that the local officers will administer the law better than anyone else, and the legislative department is powerless to impeach their judgment. Ex parte Corliss, 16 N. D. 470, 114 N. W. 692.

There is great wisdom in permitting those of the same community to manage their own local affairs. They grow in sympathy and mutual kindness. They observe the precept: "Bear ye one another's burdens," and they naturally resent interference from outsiders. It is sure to do more harm than good.

The act is not constitutional. It does not authorize the removal of any city commissioner, and the complaint does not state facts showing a cause for removal.